Mr. Suttoth, may I please the Court, James Suttoth, on behalf of the Appellant, Mr. Glyn Lamonia. Your Honor, I know that, Your Honors, I know all of you have reviewed the briefing and the facts in this case, and so the facts in this case are, I wouldn't say complicated, but rather intricate and rather lengthy. It's a lengthy history in this case, a lot of intertwining claims, and so what I thought was most effective to do in the limited time that I have is I want to talk about three primary issues that I see at the district level, those that I think are most compelling, those that are most troublesome, talk about those issues and make myself available for questions. The first surrounds this noose issue. As Your Honors are well aware, my client, Mr. Lamonia . . . Yes.  . . has a whole line of cases of district courts all around the Fifth Circuit that have held that wasn't sufficient to be severe or pervasive. Why is that wrong? Thank you, Your Honor. The reason why we believe the district court is wrong on that is for several reasons. The first of which, the vast majority of those cases that the district court cited to, the problem that was in that case was not that the noose is not in and of itself severe. Those cases held that it was. It was an anathema. It was inappropriate. The problem there was that it hadn't been there long enough. There was almost a temporal proximity that was read into how long that noose was present. Now, here's why that's troubling. In those cases, the vast majority of those cases, the individuals simply did not report the noose existing. So, as you sort of get to the district court and its analysis, it almost becomes a should have known standard. You're looking at a temporal proximity in those other cases to say, well, since no one reported it, how long was it present? Therefore, the company should have known. It becomes a liability question to the company, not so much a severe and pervasive issue regarding whether or not the noose is inappropriate or constitutes hostile work environment. That's the first problem. The first problem is reading into it, a temporal proximity component that doesn't exist. The second problem is the conflating of this court's precedent, which is very clear about the fact that severe or pervasive is destructive. What's your best case that a single event like this or single occurrence can be severe enough? For a hostile work environment claim. That's what we're talking about. Right. For a hostile work environment claim. I would say, Your Honor, that the arguments that we made for the extensions of Wood v. Cantrell . . . But in that case, it seems distinguishable to me because that's the case, if I recall, where the employee was basically, offensively, dressed down and ridiculed in front of all his co-workers. Right? By a supervisor, I believe. By a supervisor, right. The offensive comment, which is the use of the N-word one time, did happen in front of his co-workers. There was an audience, pretty important audience, correct? Well, it was in front of his co-workers. He had a pretty important person who delivered it because it was his supervisor. It does change the analysis in the fact that it's not co-worker harassment, but rather supervisor harassment. Well, but here, in here, we don't have either of those factors. Well, that's interesting. Part of the reason why we don't know one of those factors is, what we have alleged in our both motion for summary judgment at the lower level and even in our briefing to this court, the woefully inadequate investigation into this case can further our cause for why there is further hostile work environment. What's the evidence that the investigation was woefully inadequate? Because, I mean, to me, the record discloses a pretty substantial investigation and a pretty immediate investigation. Well, what was certainly immediate was that my client reported immediately. So, there's no question he was subjectively offended. He went to the police, in fact, and reported it as a hate crime. He then went further to his bosses and to Human Resources and complained about it. So, he did do that. What do you contend that the company, Westlake, failed to do in this investigation? What Westlake failed to do, from our standpoint, is several things. The first is, once he raises the complaint to Human Resources, Human Resources only tasked one individual with looking into this issue, and that individual never spoke to a single electrician like Mr. Glomimonia. One of the bases, if you look at Barbara Downer, who is the Human Resources manager, and the individual that she tasked to actually be boots on the ground to go do the research, if you look at the email traffic between the two of them, one of the issues that's raised is she says, well, I spoke to a lot of mechanics, I spoke to a lot of other tradesmen out there, and they all said that this could just simply be the tying off of the wire, the tiring off of the solder wire. It doesn't, it's not necessarily in the form of a noose. Now contrast that to Glomimonia, who was the only electrician, and solder wire is only used by electricians, who testified in his deposition, I have been doing this for the in this way. There's no logical or practical reason why you would tie it in this way. It would take pliers to bend and contort that wire to create quite some effort. All right, but back to the original question, where, I guess, if Woods is your best case, Woods is your best case, but how does this incident, basically in isolation, rise to the level of what happened in Woods? You said the investigation was woefully inadequate. Yes, Your Honor. Anything else? I want to address that second question you just asked me, but if I can briefly wrap up the first question that you asked me, why it was inadequate. Why it was inadequate was to not speak to a single electrician that was out at West Lake Management who could have told them the context behind why that was so unusual. Is this prong four or prong five of the analysis? I believe that this would go to prong five of the analysis. The district court just didn't reach that, right? Not at all. Yeah, but the plaintiff did argue prong five as well as prong four, correct? I'm sorry, Your Honor. Plaintiff argued prong four, which has to do with the severity, and prong five, which has to do with the investigation. My recollection was that we had argued both of the issues, the district court . . . Yeah, the district court says that the plaintiff, that both, that summary judgment was moved for on both grounds, four and five. Right. Which . . . Just to make sure I understand is you're saying that the investigation can kind of fall under four and five factors? I think that it can. I think the lack of the investigation . . . I don't see how. I don't understand that. The fourth prong has to do with the severity of the actual incident, which is this. We have a picture of the . . . Right. The so-called news, the news that he subjectively thinks it's the news, and that's the evidence we have. But the fifth element has to go to the investigation. Well, for all of the reasons that I answered to Judge Wood, why I believe the investigation was inadequate, I do contend that the district court never really reached at least in-depth the issue of the fifth analysis . . . Yeah, but we can affirm on any ground that's supported by the record that was pressed below. Yes, Your Honor. As far as the fourth factor, though, the severity of it, I do think that Woods may be my best case, but I don't want to discount all of the other cases mentioned in my brief. They talk about the unique severity of a noose on the same level as the use of the N-word. But we have cases in our circuit that say one event like that is not enough. You do have cases like that, which is what the district court relied upon, and that was the argument that we were making with the Woods case, was that this was the first time that we saw the use of that one word so pronounced, and Your Honor's right, in very compelling circumstances. I won't pretend like the circumstances in Woods were not compelling. What I am arguing is, is that the exact same anathema and problem that exists with the use of the N-word exists with the use of a noose, and to somehow carve out a temporal component and say that this unique offensiveness to this individual, this subjective person, we will allow that unique offensiveness to occur with the one utterance, the one utterance of the word, but we won't allow it. You're talking about a temporal dimension. We're looking at a hostile work environment claim, and it can be pervasive or it can be severe, but our cases talk about egregiousness of a single severe incident. What we're trying to get at is, we've got to say that he basically couldn't work there anymore. It became intolerable to work. He argues a constructive discharge claim as well. I mean, and so I'm just trying to get at what was so severe in terms of what is supported by our case law, this single incident. I appreciate that question. Because if you get into the temporal aspect, this incident stands pretty much in isolation. Well, I'm going to jump ahead a little bit. I'm also running out of time because I guess the third point that I wanted to bring up was about the hostile work environment. That was one of the fundamental problems I had with the district court was the isolation of our hostile work environment claim to simply the noose. That was never an argument that we made. It was never supported in the briefing. We supported- I thought the district court just said that the plaintiff had sort of focused the argument on the one incident for hostile work environment. I suppose that that would be a plausible reading of the opinion, but the way that we read it was that the court took each individual instance in isolation, both the failure to promote, the failure, the transfers, the racial slurs that he alleged, the presence of the noose. Each one of those was sort of in a divide and conquer approach, if you will, was looked at individually. And once each individual element was reduced, then the sum of the parts equaled zero. And the court simply said, well, you don't have a hostile work environment after looking at them in isolation. And that's the court- that's the case for this court, the- I know I'm out of time. I can address it on my rebuttal. Yeah, you'll have rebuttal time. Just for the record, I was thinking of footnote four of the district court's opinion where the district court parses, you know, the different possible grounds, but then says that- I think that's what I was thinking of. Okay. Thank you, Your Honor. Thank you. Now, we will hear from Amicus. Ms. Smith.  Dara Smith. May it please the Court. Dara Smith. Thank you. I'm Dara Smith for the EEOC. Uh, I'd like to address three issues, but first, I'd like to speak to the noose question that, uh, Your Honors have been discussing. Yeah. Just explain how- what's the best example or case I want to point to? Is it- is it the control case that this one incident is severe or pervasive enough to meet element four? I would say our best case is the Hudson case that we've cited in our briefs. It's an unpublished decision, but it's very helpful because it says that under the proper circumstances, a noose could be enough, and it didn't find that the noose was enough in that case because there was no competent summary judgment evidence to show that the plaintiff had even seen it or that it was in the plaintiff's workspace. And of course, in this case, the plaintiff did see it, and it was in his workspace. So these would appear to be exactly the circumstances that the Court was contemplating, and Hudson is the proper ones. That has been cited in the Johnson case we cited in our briefs, which is a published decision after that as an example of the type of incident that could be extremely serious. And of course, if it is a single incident, it does need to be extremely serious. That's the standard. Also, it sounds like that you are agreeing that not every incidence of a so-called noose- and I say so-called noose because- because, I mean, I'm looking at a picture of it. And so to simply blithely say, well, this is a noose case, strikes me as begging the question, but it sounds like you are agreeing that not every instance of a so-called noose in the workplace is enough to, per se, create a hostile work environment. You have to consider the circumstances. That's correct, Your Honor. You always consider the totality of the circumstances.  Okay. And what other- I'm sorry. What other circumstances are at play here? I mean, do we consider the investigation of the company as counsel, your- not co-counsel, as counsel for plaintiff was contending, or what other circumstances are at play? The circumstances the commission referred to in the briefing were the history of racial conflict in this workplace, including use of the N-word, roped noose that the plaintiff once saw, plus the other discriminatory actions that he alleged. And those are not necessarily- it's a fact-based inquiry whether they would be considered part of the hostile work environment analysis, but in this case, what we've explained is that they have to be considered as background. So all of those background facts, in addition to the other discreet acts that he has alleged, should be considered as context in this case. This wasn't a workplace where nothing had ever happened, and he walked in one day, saw a wire that he believed to be a noose, and suddenly you have a hostile work environment out of the blue, which is, is more similar to what happened in the Morris case, that the district- But if the other Title VII claims, I mean the failure to promote claim, for example, if those claims fail, doesn't that undermine your argument that the background facts matter? Or, or add this kicker severity element? It would affect the analysis, but it wouldn't be fatal to the analysis. These other events that have taken place, this history of racial conflict that he testified to, like being called the N-word repeatedly, like having the N-word written in graffiti on the walls, like seeing an actual rope noose in the workplace, these are all things that he testified occurred in his workplace. So that's not to say that these are necessarily actionable events now, but they are relevant context, and, and in the hostile work environment analysis, that context is relevant. What did Westlake fail to do in its investigation of this incident that, um, substantiates the fifth prong, which the district court didn't reach, but which was litigated? The commission hasn't taken a position on the adequacy of the investigation or, uh, employer liability in this case at all, Your Honor, so we, we don't have a position on that. Um, we, we've only, uh, said that the severity, we, we've weighed in on the severity issue. So I'd also very briefly in the time remaining like to address the retaliation claim, what, to say that a performance improvement plan can be, uh, an adverse action, a materially adverse action under the Supreme Court's Burlington Northern case, and under this court's case in Ray versus Tandem Computers, the district court incorrectly cited a portion of Welsh versus Fort Bend that referred to the adverse employment action standard for discrimination cases when, in fact, even in Welsh, the court said that, uh, performance improvement plan might be, uh, it didn't reach the issue, but it could be, uh, materially adverse action for the retaliation. Well, it just didn't reach the issue. It said the concept is slightly broader with respect to retaliation, but it did not reach the issue. It is broader, um, but it's really, it's a, a different inquiry about whether it might dissuade a reasonable employee from engaging in protected activity. Thank you, Your Honors. Ms. Anderson. Good afternoon. May it please the Court. Let me just ask you the same question, but in reverse, in terms of the district judge cited all these district court opinions and citing that step four wasn't, you know, made, and so the question is, did he just create a bright-line rule? I mean, how did he consider the totality of the circumstances in deciding that, um, I'm looking at the opinion here, it just says, basically cites that a single incident, incident is not severe or pervasive enough to all of the conditions of employment. So, did the district judge just plan a, a bright-line rule, or did he look at the totality of the circumstances? Yeah. He actually quoted the same standard that, uh, the Fifth Circuit used in the Woods case, which was totality of the circumstances. Um, he quoted that same standard, obviously, you know, not, um, not from Woods, but from other cases pre-Woods, which Woods essentially reaffirmed. So, he looked at all of the circumstances, and I'll say that, um, if there's one theme in this case, it really emerged when I was reading back the U.S. Supreme Court's, uh, opinions in Burlington Northern and also in Nassar, context matters, that's in Burlington, and text may not be divorced from context, that's in Nassar. And that's true not only about statutory interpretation, it's also true about the facts of the case. You have to look at facts, you have to look at the material facts, and here, I think what is, is important, I'm, was picking up on some of the questions earlier, is to look at, in this particular case, what is distinguishable about the solder wire that was twisted back on itself, is con, in contrast to some of the other cases, it's not a rope. It's not, there's not even a knot in the, in the, the object, um, and if you look at the definition of a hangman's noose that the plaintiff cited, um, that appellant cited in his brief from Louisiana's hate crime version, hate crime statute, that particular definition, um, it doesn't even meet that, that definition of a noose, which is, quote, a rope tied in a slip knot, which binds closer the more it is drawn, which is. Well, I take it on summary judgment counsel, we have to accept that the plaintiff subjectively thinks that this is a noose, right? I am not even at all commenting on whether he subjectively believes or not. There is an objective component, um, and I think going to . . . Let's assume it is. Yes. And . . . How do you win on the law? Say that one more time. How do you win on the law? Assume, assume it is as he perceived it. Yes. Um, how, how do we reach your position or the district court's position that this one incident isn't severe enough? Oh, certainly. Um, I think first of all, you have to take into account that the moment it appeared to him, he complained. The company, the . . . Isn't that Hudson? Isn't that why in Hudson they said they didn't complain? Is it an example of why they said it didn't meet the standard? So, doesn't that support the appellant's argument that they did complain? Oh, I don't think so. I actually think that to hold that whether, whether a single incident is severe or not turns on the question of whether somebody complains. I think you're going to be hearing a lot more cases than, than, than was ever intended by Congress. It wasn't just complaining. I'm sorry. No. It wasn't just complaining at Hudson. It was complaining. It was actually him seeing it versus, you know, those are the distinguishing kind of factors. It wasn't just that one factor because at Hudson, he didn't see it. It was in a break room or somewhere else it appeared. But those are the examples we, we use to say this didn't meet the standard. So, it was a multiple of the, and again, the totality of the circumstances, it wasn't just that. Yeah. I mean, I think the court looked at, looked at all of the circumstances that we have here. He looked at what it was. Let me ask you this. How does this differ from Hudson? Everything that this court used to say Hudson didn't meet the standard happened in this case. So, tell me why that would lead us down the result to say this incident under the totality of circumstances is enough. Yeah. I'm actually not sure that, that I see the connection with Hudson. I think here we've got an unsourced item that doesn't appear to be what you think of and what by, by at least criminal law definition is, is a noose, is a hangman's noose. Oh, but, but just hold, hold that thought. Yes. Assume it is. Okay. As he perceived it. And then assuming it is. Then talk about how Hudson is different. And then assuming it is, and I, I realize I'm navigating a little over into the fifth element from the fourth element, but I do think there's some overlap in terms of the material facts and where we go to. I was going to ask about that also. It was there for a short period of time. It was immediately removed. And so I don't think that, and in addition, and I actually don't think this is the standard, but this particular plaintiff remained employed after this incident for a significant period of time. And not only did he remain employed, he didn't suffer any adverse employment action for discrimination purposes. He also didn't suffer any materially adverse action that would have dissuaded him from making any type of complaint about anything that he thought was a problem in his workplace because he made further complaints after this happened. So I think you have to look at the constellation of, of all of the, the, the constellation of circumstances that surround the event. And I don't think that under the facts of this particular case, which I do think the judge took the totality of circumstances into account, you can meet that standard of security. What additional facts would you think would need, need to be shown to get us over the, over the edge? I'm sorry, what did you say? What additional facts would you need for it to be over the edge? You said, in this case . . . Well, I think, well, first of all, yeah, sure. First of all, I think that if you look at some of the other cases that were cited, you had situations where a supervisor was aware of or made aware of a noose and allowed it to remain in the workplace. There was one case in which, one of the cases that was cited, the supervisor actually said, hey, where's my noose? Inquired about the, the location of it. That certainly is not the response that you would want from an employer or from management. What about what the agency says, these background facts, the other things he testified to? Yeah, I find that peculiar because he did not argue in the district court that the, the background facts as I understand them are these sort of vaguely alleged things that happened before 2016, before Westlake even acquired the facility. And those were not argued in the district court as being part of the alleged hostile work environment. And there's certainly no, this I think is important, and I'm going to mention the Baird case, which was actually, I believe it was cited by the EEOC. It might have also been cited by the appellant. In order to start connecting discrete events or things that, that are, are different to, to say that whether it's background or whether it's part of the same continuing unlawful employment practice, there has to be some sort of connection. And this is from Baird, which was quoting Harris and Morgan, U.S. Supreme Court, that, that these items collectively, they must be adequately connected to each other. Acts which constitute the same claim are part of the same unlawful employment practice, as opposed to being an array of unrelated discriminatory or taliatory acts. So there was really nothing presented to the district court about these, these more dated incidents, who was involved, who said them, or anything to connect them to Campbell or to Thompson, who were the two supervisors or managers at issue who, who took the brunt of Lamonia's allegations. So would it be your opinion that if this case was actually going to trial, all these background facts and the history, you, you would say that none of that evidence would come in? I would say that would not come in, yes. I don't, I don't think that those, those, I think they're too antiquated. I don't think they're connected. I don't believe there's any sort of connection that the Supreme Court and the Fifth Circuit would require in order to, to tie them into this same hostile work environment that he's alleging, which turns on or centers on this one news incident. If I may ask about the incident. Now, whether these facts in the district court's opinion fall under the fourth prong or the fifth prong, I don't know. Maybe, maybe they, as you say, overlap. I, I don't know the answer to that. But the district court's, in, in the fact findings, says that after this complaint, after he made the complaint about the, the news, the, what appear, what appeared to him to be a news, the officials at the company assured him they were investigating the incident. Human Resources staff investigated the news incident through December 2018, January 2019. Two people, two managers interviewed everyone with access to the work area who were unable to find anyone who noticed something new. The Human Resources Director, Boulanger, kept in touch with the plaintiff about the status of the investigation. Now, I guess I have a two-part question. Are any of those facts disputed on this summary judgment record? Not, not allegations of dispute. This is a summary judgment record, so you have to actually point to some back dispute as to these things. Are any, is there any fact dispute about all of this? No, there are not. And there are actually more facts, and they may have been referenced in, in the court's ruling. They certainly were in the briefs, such as the fact that HR interviewed every person who had access to the, the, that worksite location, that particular plant. They were all interviewed, and none of them said that they saw anything that was new or noteworthy. And there were also no other incidents of racial, racial harassment reported. He also was allowed to return to the other plant with his consent. He wanted to do that. That was allowed. None of this is in dispute. I actually sort of would have expected that maybe the fifth element would have been something the court would have gone to, because I think that's very strongly supported on . . . It was argued below. On, on the record. Wasn't it argued below? Yeah. So, that, that, I know that, that was in our, at least in our opposition, but I believe . . . But your position is we wouldn't need to remand if we wanted to evaluate the fifth. No, I think it can reverse and render on the record based on the undisputed facts, that the investigation was prompt, and it was effective. That's what Title VII requires, and there's just no dispute whatsoever that, that this was taken care of immediately. And I do think . . . What of, what of the plaintiff's contention that the fact that they couldn't figure out who did this, and couldn't find, just shows that the investigation was sort of half-hearted or superficial? So, the fact that some, something can happen anonymously, and an employer cannot find that out, is going to somehow mean that they haven't effectively investigated? Do they have to become clairvoyant? Do they have to become all-knowing?  These are employers, right? And these are HR professionals, and sometimes they hire outside people, and sometimes they don't. But no, I don't think they have to find the answer. I mean, I'll point out, this case was litigated. You've seen the record. There's a lot of information in it. The lawyers representing Mr. Lamonia apparently couldn't figure out, through discovery and their resources, how this wire ended up the way it did. There is an assumption that someone, you know, configured this wire with a twist in it for some illegal, some nefarious purpose. We don't know. But I think the fact that Westlake couldn't figure out, after interviewing everybody who had access to the facility, does not mean that somehow their investigation was, you know, was not sufficient. It was effective. It was effective in that the item was removed immediately, and there were no further complaints of that type. And that's what the law requires. Well, there must be a reason why there is a fifth element to a hostile work environment claim that involves an investigation into an event that is alleged to be severe enough to possibly create a hostile work environment. That's my only point, was that there's a bunch of facts in the record, and I don't see anyone saying that they're disputed. Yes. No. If I may move. Yes. My colleagues may have more to ask about that. If I may move to the retaliation claim, and specifically, the point about whether the PIP, and as I sit here, I don't remember what that stands for, but it's an acronym. You know what it stands for, and whether that can constitute an adverse employment action with respect to that. The argument here is that the Welsh case is being miscited for that proposition. It is true that the sentence that the district court quotes is from the discrimination part and not the retaliation part. So, I guess, I'd like for you to discuss that, and please be sure to get to what if we disagree with your argument, are we required to reverse and send it back down, or is there any other grounds for affirmance? Yeah. I think you are not required to reverse and send it back down. I did notice the quote from the Welsh case, which did . . . there were a couple of Welsh cases, and it did involve both a retaliation claim and a discrimination claim. The sentence in the court's opinion immediately prior to that particular quote gives the exact correct standard, the material adversity standard. So, the court, in fact, cited and, in my view, did use the correct standard in analyzing the facts. What I think is most important for this panel to know, or to keep in mind, is that you have to look at the totality of the circumstances. I don't think that a court can say that every single PIP will never, under any set of circumstances, be materially adverse. I also don't think they can say the flip side of that. There's just too much variation in the way that employers conduct and run their business. I think it's no . . . I don't think that it is a coincidence that the vast majority of the cases that create a lot of the . . . where you find a lot of things like whether it is a PIP or some sort of lesser than an adverse action constituting an adverse action or something that is materially adverse come out of the law enforcement arena because they are so segmented and there are so many different units and they do so many different things. Transfers in that kind of a business, in that kind of an employer, obviously can create an issue. If there's no bright line rule, is it a factual question? How do you evaluate whether a PIP can support a retaliation claim in terms of . . . what's a trial judge supposed to do with that? Good question. I think you have to look at whether there is evidence of consequences. That's important in this case because if you look at the PIP, nothing on the PIP says, if you don't do this, you'll be fired. This is a final warning. This is the next step. It was a performance improvement plan. The purpose of it was to improve the performance in the areas that were specifically described in the plan. In fact, when PIPs work, employees succeed and the employee gets off the plan. Now, we don't know what happened because Lemonia ultimately went on medical leave and then he resigned. However, if you look in the record at the PIP, over two months the PIP was reviewed with Mr. Lemonia. And guess what? His performance became acceptable after the end of March review. And so that PIP was doing what it was supposed to do. There's nothing to indicate that there was some threat of consequences over him that would have chilled him from saying anything if he felt that there was. So is your view that a PIP is only an adverse employment action and retaliation claim if they get to the point where it fails? No. So I'm just trying to figure out where we draw the line in evaluating whether a PIP can be an adverse employment action and retaliation claim or not. Yeah. I'm not sure that it'd be a line like this. It'd probably be more like this, right? And it would probably depend upon the facts of each case, which is kind of like what I was trying to say about how— So it's a fact dispute, is it not, then? Say that again? Is it a fact dispute, then? No, I don't think it's a fact dispute at all. I think that on the record, this PIP objectively can't be considered an adverse employment action or even something that was materially adverse that would have dissuaded a reasonable worker from complaining. And in fact, it didn't dissuade Lamonia from making a subsequent complaint. So I'm not so sure that that's the ground that the district court relied on. But let's assume— Yes. Let's assume I disagree with you on that point and that there is a fact issue about whether the PIP in this case constitutes an adverse employment action. Do you lose at that point? Do we have to remand? Ask that one more time. So if I say, no, you know what, the district court was incorrect. There is a fact issue as to whether this PIP constitutes an adverse employment action. Do I have to remand at that point? Is there any alternative ground that you're arguing for affirmance? Well, of course. On retaliation, I mean, there are a couple of arguments. I think first and foremost, causation. There is zero evidence on retaliation, and also on discrimination for that matter, that there was any sort of causation, any link between the alleged protected activity and the materially adverse action, or in the discrimination context, the adverse action. Can we decide that, or do we have to remand it back to the trial judge to consider, go on and do the full analysis? No, I think that's absolutely within the province of this court to decide. In fact, the Supreme Court has said that even if a plaintiff creates a weak issue of fact, summary judgment still is proper. So there aren't, you know, you don't have to draw the bright line. And I think you don't have to remand where there is not a genuine issue of material fact. And with respect to the PIP in this case, based on the very specific document, there's simply no evidence that there was any adversity to the employment, any material adversity to the employee over having received that PIP. Okay. I have 17 seconds left, so I'm going to . . . Anything else? No, thank you. Stop early. That counts as stop early. That's all right. You will take the ten seconds back. Thank you, counsel. Mr. Suttoth, you have some time for rebuttal.  Thank you, Your Honor. First . . . We're going to start with the issue of element five of the hostile work environment. And assuming we agree that the trial judge did not find a correct result on step four, why can't we affirm on the fifth step based on this record? Based on this record for a few reasons. One, whenever you look at the investigation, one of the prongs for the fifth element is if the investigation was effective. Did it remediate the concerns? On this record, which is what's remarkable about this PIP, by the way, what is on this record is from the minute that Mr. Lamonia complained in December of 2018 about what he believed to be a noose in his working environment, a mere two months later . . . See, that's where the context matters. He had been working at this company and its predecessors for 28 years. Not once was he ever placed on a PIP or his performance ever questioned. For the first time in 28 years . . . I'm not sure he was talking about the PIP. I thought he was talking about the noose. He was talking about the noose. He was talking about the investigation. The fifth element hostile work environment claim related to the noose. Right. And the point I was trying to make, Your Honors, was that one of the points of that element is, is that the investigation must be effective at actually ameliorating the concerns. What happened in this case was Mr. Lamonia had been complaining about discrimination and harassment prior to this. It continued after. And so, on this record . . . Wait, wait, wait. He's asking, if I may, and I don't mean to put words in his mouth. There was a noose incident. They investigated it. We've got fact findings from the district court about the extent of the investigation. Why can't we affirm on that ground, that being a different element from the fourth element? Because that investigation did not effectively ameliorate the discrimination. The noose we're talking about. I mean, the investigation was geared toward, okay, how did this end up here? Who was responsible for this? Let's get to the bottom of this. Right. Are there contested . . . Can you point to evidence in the record that shows that the investigation was a sham or just was . . . I don't know. I just . . . Well, the evidence in the record that I would point to would be, I'd say, three prongs really quickly. I can think of off the top of my head, and I can supplement later if Your Honor is interested. But I would say, number one, the fact that Mr. Lamonia was more than willing and able and ready, and it would have helped the fact finder to listen to an electrician about why this was, in fact, a noose. The fact that no one was spoken to about that point. The second point that I would raise is the fact that the discrimination, the harassment, the retaliation that he received still continued post that noose incident. In fact, we believe there's a connexus because the temporal proximity is so close. Those facts were in the record. A final point that I would bring up about the investigation not being effective, Barbara Downer, the human resources manager in this case, in her deposition, this is Record on Appeal 2021, ROA 2021, she is asked, with respect to the solder wire, do you believe that was a noose? And she answers, it looked like a noose. How does that show the investigation is inadequate? She's admitting that it looked like a noose. Why doesn't that show the investigation is, in fact, genuine? Because that investigation did not result in any ultimate finding of who was the perpetrator. So any time the investigation is inconclusive or we don't get to an answer, problem five is not met. I think that's a fair question, Judge Wilson, but the reason why . . . It's a fair question. My question is what case supports that? Well, but the reason why I wouldn't go that far, Your Honor, to say that any time the investigation is inconclusive, it's discriminatory, the reason I would not go that far is because one of the things that the investigation must do is it must be at least reasonably calculated to put an end to the discrimination. And on the facts in this record, there was absolutely nothing that Westlake uncovered or did to put an end to discrimination. In fact, it got worse. Because for the first time in 28 years, he was placed upon a PIP, which in all due respect to my opposing counsel, I think the record is clear on this. Help me with the PIP. Are we evaluating the PIP under the sort of traditional plaintiff shows prima facie case, employer comes back with legitimate reasons, and then plaintiff has to show pretext? I don't believe so because I think there's been a conflation between the two standards. The PIP we look at materially adverse because it's in a retaliation context, not an adverse employment action. I'm not suggesting that he was fired because of the PIP, but it is a misstatement of fact to state that he would not have been terminated or disciplined had the PIP not been successful. And by the way, one of our other claims is a failure to promote claim. One of the things in the score sheets and one of the things Westlake looks at is has the person been on a PIP when they're evaluating whether or not they're eligible for it. But he wasn't at the time he interviewed. No, he was not. But let's go back to the PIP. Do we or do we not look at whether there's pretext here? Because it is in the retaliation context and not in the discrimination context, I don't believe that you need to look at pretext. But even if you did look at pretext in this case, you have a two-and-a-half-month temporal proximity that gets me over prima facie. Once I pass prima facie, then the pretext analysis would kick in and we would make our argument there was no legitimate basis for his placement on a PIP given that his performance was not in any noticeable way deficient from his past 28 years. Counselor, I think Judge Mazzano has another question. Oh, yes. I just wanted to follow up on a question I've asked this already. But assuming we agree that element four is met, why should we remand the case versus . . . I know we've had a lot of discussion about what the record up here is. But answer the question, why should we send it back to the trial judge to go on and do the analysis under step five? I would say for a few reasons. The first is, if I take Your Honor's hypothetical, the discrimination part of the case fails. This would not be the first time that a retaliation case lives on when the underlying discrimination case that underlies it fails. So even if this court was inclined to say, despite Hudson, despite their arguments that this is not a sufficiently severe or pervasive incident with the news, the retaliation component, what was most stunning I think about the district court's opinion that we didn't even hit prima facie, the retaliation component of this case needs to be remanded back for further analysis. And I think quite frankly it could be reversed on the record as it is. That wasn't the question I really was asking. Maybe that's my inartfulness in asking the question. No, no, I apologize. What I was asking is, I'm talking about the hostile work environment claim. If we end up agreeing with you that step four was met, give me your best argument of why we should remand it. That's why I try to say we had this discussion regarding what the record said on step five. But tell me why, if that's the only claim that's viable, and we say that you meet step four, why should we remand it back for the trial judge to do the rest of the analysis? Assuming that step four is met, why remand back? That was the question I was asking. Okay. Thank you. If assuming that step four has been met, you would remand back because on the record in this case, we believe, we contend, the appellants contend, the district court did not meaningfully analyze whether or not the investigation was reasonably calculated to place an end to the discrimination. And the records of this case, the facts of this case, we contend it actually did not ameliorate the discrimination. It got worse. Thank you, counsel. Thank you for a good argument on all three sides. And the case is under submission. This panel will be in recess until tomorrow afternoon.